J. Irwin Shapiro, J.
Motion by defendant New York City Transit Authority for a new trial ‘ ‘ on the grounds that the evidence set forth in the affidavit and the exhibits referred to above is newly discovered evidence and would have the effect of changing the result upon a new trial which should be granted in the interest of justice.”
The accident occurred on December 22, 1956, while plaintiff was alighting from defendant’s bus. The door of the bus closed *672 on him, the bus began to move “ and my body was twisted and my foot was caught under one of the legs.”
The jury, by a unanimous vote, awarded plaintiff a verdict of $65,000 and defendant now seeks a new trial because “ defendant decided to investigate further even though it was after the trial ” and “ the results of that investigation disclosed the newly discovered official documentary evidence which is the basis for this motion, namely, that Dr. Joseph Buchman is the brother-in-law of Max I. Cohen, Esq., one of the attorneys of record for the plaintiff.”
The plaintiff was taken to Jamaica Hospital from the scene of the occurrence of the accident. On April 4, 1957, he was admitted to the Hospital for Joint Diseases where Dr. Buchman had been the chairman of the medical advisory board and was then on its staff as an attending orthopedic surgeon.
So far as the record discloses, he did not know Dr. Buchman prior thereto. Dr. Buchman first saw plaintiff while 1 ‘ making rounds ” on the day the latter was admitted to the hospital. The first recorded ‘ ‘ personal examination ’ ’ of plaintiff by Dr. Buchman took place on April 10, 1957. The examination consisted of ‘ ‘ first, a review of the history as it was obtained by the residents, a review of the previous examinations made by other members of the staff, a review of the clinical findings, that is, the blood chemistries and so on and so forth; and then my own examination. I questioned him and I had additional history which I obtained. And then on my examination I found that he walked with a limp-, his trunk was shifted to the left, and the spine was deviated to the left in the dorsal region, which is the upper part of the back, and somewhat to the right in the lumbar region, which refers to the flank. ’ ’ The patient * ‘ had a congenital anomaly at the lowermost portion of the spine.” After this complete examination the doctor came to the conclusion that there was “the possible presence of a herniated disc on the right side at the lumbosacral level.” This conclusion was arrived at by him after a 1 ‘ myelographic study ’ ’ which is “an examination of the spinal canal by means of an opaque material which we inject into the spinal canal and then examine it under X-ray to see ”. Dr. Buchman frankly volunteered the information that the conclusion arrived at by him after the myelographic study was not concurred in by another doctor on the staff who found “ no gross changes.”
As the result of this difference of opinion the plaintiff was re-examined and “ discussed with the staff ” on April 17, 1957. After the discussion with the staff and after further personal examination in which he continued to maintain the same diag *673 nosis the plaintiff was operated on by Dr. Buchman ‘ ‘ on April 23, 1957 * * * to explore the area, and we found that he had a degenerated disc at the level between the * * * at the lumbosacral level; we removed that disc and performed a spine fusion which extended from the fourth lumbar down to the third sacral segment. * * * It includes two movable segments and three segments which are immovable so that the movable segments are moored, so to say, to the immovable portion and thus prevent motion in this area ’ ’.
The conditions found by Dr. Buchman as a result of the operation were described by him in these words: ‘1 The overall description of the thing would be a lumbosacral derangement with a herniated intervertebral * * * or a herniating inter-vertebral disc superimposed upon a previously existing asymptomatic anomalous condition ”. “ There is no causal relationship between the congenital anomaly and the accident, incidental to the bus incident”. The degenerated disc in this case was caused by 11 The twisting of his back which he experienced when one of his legs was caught in a door and he was being pulled along by the bus ”.
The defendant, admitting the serious nature of the injuries claimed, disputed the fact that they were caused by the bus accident, but contended that they resulted from the previously existing anomaly in plaintiff’s back. Dr. Robert Tuby and Dr. Sidney A. Bernstein were called to support the defendant in that position. Dr. Tuby testified that in his opinion: ‘ ‘ this patient was suffering from the effects of a pre-existing congenital anomaly of the fifth lumbar vertebra. Dr. Buchman explained it very thoroughly. * * * So that primarily the purpose of this operation was to stabilize or fuse this unstable congenital pre-existing vertebra. ’ ’
After detailing the reasons for his opinion he stated: “ So based on that, I would say that this patient had this pre-existing transitional or congenital vertebra for which the doctor operated on, and I see nothing in the record to indicate that there was herniation of this material from the disc into the space pressing on the nerve and causing this neuritis which he had. As a matter of fact, he still has the same neuritis today; the records indicate that the original, loss of sensation over the outer aspect of his right leg, in the foot in the large toe, is still present today. ’ ’
Dr. Tuby summed up his findings by saying: “ * * * my opinion is that the accident had nothing to do with this residual * * * with this condition which developed subsequently and required surgery, your Honor. It had nothing to do with it.”
*674 Dr. Bernstein reviewed “ the records of the Hospital for Joint Diseases and other records, records of other physicians, and this was my opinion: That the records in the case differed somewhat as to the actual onset of back pain. The earliest history that the patient gave to one of the physicians on the service was that the back pain began approximately five weeks after the accident. In this record he said that he was out of work for two weeks, and then he went back to work, and after he had been back at work for about three weeks, that’s when he first felt pain.
“ Then, furthermore, in the record there was no — there was another record in which he said that he had no back pain until March 18, 1957. That was the story that was given to the resident who took the history when he was admitted to the hospital.
* * *
“ It was, therefore, my opinion that the patient’s back symptoms were not causally related to the accident of December 22, 1956. If this had been causally related to that accident, he should have had his symptoms either immediately or within the next day or two definitely.
“ In view of the fact that the first history of a back condition that was given in this record that I studied was five weeks later, it was my opinion that it was not causally related. Furthermore, the medical records indicated that a herniated * * * there
was some question as to whether or not a herniated disc was present on the myelogram. The myelogram is a special X-ray that’s taken to see whether there’s a herniated disc present. The X-ray man, Dr. Pomeranz, reported this as negative; on the other hand, the operating surgeon thought that there probably or possibly might be a herniated disc there at the time of operation. There was no report of a herniated disc. I, therefore, felt that this patient’s trouble with his lower back was due to this congenital lesion, this malformation, if you will, in the lower back plus the possibility that the work that he did as a mechanic and gas station attendant required a great deal of bending and lifting.”
It is thus obvious that there was a sharp difference of medical opinion as to whether the accident was the competent producing cause for the injury to the plaintiff’s back which necessitated the operation performed upon him by Dr. Buchman, or whether it was the pre-existing anomaly which necessitated that operation.
The size of the verdict indicates that the jury accepted the opinion of Dr. Buchman, and the defendant now seeks a new *675 trial because of its discovery that he is related to Mr. Cohen, one of the attorneys for the plaintiff.
On the trial, plaintiff’s doctor was asked if he had recommended the attorney to the plaintiff and he answered in the negative. The defendant thereupon offered, and there was received in evidence, the notice of retainer filed by plaintiff’s attorneys with the Appellate Division. It states: “ Client
unknown to undersigned prior to accident. Client referred to undersigned by Dr. Joseph Buchman.” From its possession of a certified copy of the notice of retainer, it is obvious that defendant came into court armed with knowledge of the fact that Dr. Buchman was the one who had operated upon the plaintiff and presumably would be his key medical witness. It therefore properly had it in court and used it in an effort to discount Dr. Buchman’s testimony. Defendant’s knowledge before the trial that the plaintiff had been referred to his attorneys by Dr. Buchman, in and of itself, should have indicated to it that there was a relationship of some kind, personal, social, fraternal, business or family, between Dr. Buchman and the attorneys for the plaintiff or one of them. The same information which it sought and obtained after the trial to establish that Dr. Buchman and Mr. Cohen, one of the attorneys for the plaintiff, are brothers-in-law, could very easily have been obtained prior to the trial, and even if that had not been done the fact of the relationship could easily have been ascertained at the trial by simply asking Dr. Buchman how he came to know Mr. Cohen, or some such similar question. This was not done although the need for further possible inquiry was pointed out to defendant’s attorney by the statement of the court that the retainer statement filed by the attorneys was not binding upon Dr. Buchman.
In summation, defendant conceded its liability to plaintiff for any injuries sustained by him in the bus accident.
The ultimate issue in the case, therefore, was whether the necessity for the operation on plaintiff’s back was caused by the bus accident or whether it was necessitated by the preexisting anomaly. This issue was most carefully delineated by the court in the charge. The jury was told: “ Now, they differ in their opinions. Basically, as I understand it,— and let me caution you at this time that you and you alone are the sole judges of the facts, not I — when I say ‘ basically, as I understand it,’ I am simply trying to give you my understanding of the facts that have been testified to by the four doctors so that you can better come to a more honest conclusion; but my *676 understanding is in nowise binding upon you because I have no opinion for your guidance as to how you should decide in this case. That is your function, your responsibility, and your duty. Mine is to tell you the law. But it is my understanding that Dr. Buchman says, ‘ This man had a congenital anomaly in his back. ’ Dr. Tuby says ‘ From a reading of the record, that is so.’ Dr. Bernstein says, ‘ From a reading of the record, that is so.’ The plaintiff says that he never knew anything about that, that it never gave him any pain, that he never knew anything about that kind of a situation in his back, and that he did heavy work dragging carcasses around, jacking up automobiles, working on tires and rims, and things of that kind, the usual kind of things that you do around and about a gas station ”.
Later on in the charge the jury was informed that ‘ ‘ in the final analysis the responsibility for determining ivhether this operation was necessitated by this bus accident or whether it would have had to happen anyway irrespective of the bus accident is for you to determine. If this operation was unconnected with this bus accident, in other words, if this man had not had that accident that day, if he had been able to go on his merry way and then he would have had to go to the Hospital for Joint Diseases at the time that he did anyway for this very same operation, then there was no causal connection between the accident and this operation. However, with this anomaly in the back, if he had no pain therefrom, if it did not show any outward signs to him, if he could have gone on for the rest of his life without any pain and any suffering, and this accident brought about the necessity for an operation, triggered the pain into the back, then you would have a right to say that there was a causal connection between the accident and the things that ensued and flowed therefrom as described by Dr. Buchman on the witness stand.
“ Now, depending upon how you decide that issue will determine in great measure the size of the verdict, the amount of the verdict, in this case, both sides agreeing that the plaintiff must recover something.” (Emphasis supplied.)
Again, and after detailing the special damages claimed by the plaintiff the court said: ‘ ‘ there is no dispute that that is a fair and reasonable amount for the operation, remembering all the time that when I give you these figures and mention these amounts, the defendant does not say that it should pay them because, says Mr. McMurrer for the New York City Transit „Authority, ‘ That is a fair sum, but we are not obligated to pay it because we had nothing to do with that. That operation was not necessitated by this bus accident.’ ” (Emphasis supplied.)
*677 Further on in the charge the court again high-lighted the difference in the contentions between the two parties saying: “ As I understand it, there is no dispute in this case about this fusion of the back; there is no dispute in this case that a bone was placed in the spine and that that is a permanent condition with a permanent rigidity. But again I remind you that Mr. McMurrer for the New York City Transit Authority says, ‘ That is so, but we should not pay for it because we did not cause it, this bus accident had nothing to do with it.’ ”
Thereafter the court reiterated the difference in the amount of the verdict that should result depending upon how the jury viewed the testimony, saying: “ So you see, the plaintiff must recover in this case, and it comes down to a question, I repeat and reiterate, as to how big or how small that verdict shall be. Was it a minor injury or was it a major injury? Did this thing which has been testified to here come from the bus accident? Was it brought into being by the bus accident or would it have been necessitated without the bus accident? That, fundamentally, is the question in this case which will answer the amount and the sise of the verdict.” (Emphasis supplied.)
After having thus had the issues sharply drawn to their attention by at least four separate references thereto in the charge, the jury unanimously elected to believe the plaintiff and his doctors. Upon this record they were well within their rights in so doing, and the effort now made to set their verdict aside, upon the basis of alleged newly discovered evidence, should not meet with the approbation of the court unless in truth and in fact the evidence is newly discovered, in the sense that it could not, with reasonable diligence, have been ascertained prior to the trial and that it would, most likely have caused a different result if it had been produced at the trial (Tripp, Guide to Motion Practice, § 120). Neither situation prevails here. This lone item of alleged new evidence, to wit, the family relationship between Dr. Buchman and Mr. Cohen could by the slightest effort and with any diligence have been ascertained before the trial. So too the relationship, if any, between Dr. Buchman and the plaintiff’s attorneys could have been inquired into at the trial. As we have pointed out defendant was on notice of some relationship between the two. In any event, in the court’s opinion, the revelation of the relationship would have had no effect in changing the amount of the verdict.
In summation Dr. Buchman’s credibility was subjected to a blistering (although legally justifiable) attack by defense counsel. He brought sharply into focus the change made by Dr. Buchman in his personal records and contended that the change *678 had been made for ulterior purposes. He also charged that Dr. Buchman had not told the truth when he denied that he recommended the plaintiff to Mr. Cohen. In doing so he referred repeatedly to plaintiff’s Exhibit N, the copy of the notice of retainer filed with the Appellate Division, and again and again called the jury’s attention to the fact that it stated that plaintiff had been recommended to the attorneys by Dr. Buchman.*
Under such circumstances the defendant should not be permitted to try out anew Dr. Buchman’s credibility or the validity of his medical opinions. Understandably, defendant does not agree with the verdict. But if verdicts can be set aside and new trials granted upon such a flimsy contention as is here presented, there would never be any finality to litigation. The defendant was cognizant that Dr. Buchman was going to be a star performer in this trial. It was for that reason, no doubt, that it came into court fortified with the notice of retainer. If it decided that the information in the notice of retainer was insufficient, due diligence would have suggested further inquiries before the trial to ascertain the relationship between doctor, attorney, and plaintiff, and its failure to make the investigation until after the trial does not entitle it to a second trial. As the court said in Collins v. Central Trust Co. of Rochester (226 App. Div. 486, 488): “Parties are supposed to prepare their cases for trial. * * * They have no one except themselves to blame for the result.”
In Travitzky v. Schamroth (277 App. Div. 1018) the court said: ‘ ‘ The newly discovered evidence to justify awarding a new trial must be 1 so positive and convincing, that it will, in all probability, produce a different result, if a new trial is had.’ ” It cannot here be stated with any degree of conviction that this alleged newly discovered one item of evidence would ‘ ‘ in all probability, produce a different result, if a new trial is had.” The probabilities are all the other way, particularly in view of the undeniable fact that Mr. Cohen’s law firm only came into this case some six months after the operation had been per *679 formed on plaintiff by Dr. Buchman, and that in the meantime and on May 2, 1957, shortly after the operation, Dr. Buchman had written a letter to plaintiff’s prior attorney in which his findings were set forth. In over-all substance, his testimony on the trial was in accord with that letter.
Cavadi v. New York City Tr. Auth. (7 A D 2d 299) is not in point. In that case the judgment was reversed and a new trial ordered, the court saying: “ on the whole record we are of opinion the verdict is against the weight of the evidence and that there should be a new trial.” There the contemporaneous entry on the hospital chart made by the doctor on the day of plaintiff’s admission to the hospital was: “ Pt. states she fell after tripping on subway steps, injuring her spine.” The basis of the action in court was ‘ ‘ predicated on a claim that plaintiff’s hand was pierced by a wooden splinter from the handrail on the stairs as she descended; that she was caused to recoil, to lose her balance, and to fall.” Said the court, “ We regard this causal attribution of the fall to be incredible; and the verdict based upon a finding of such causation to be against the weight of the evidence.” The court pointed out that “ all earlier statements of plaintiff which have been recorded make no reference whatever to any part played by the handrail in her fall.”
In connection with the occurrence, the doctor who had made the entry of ‘ ‘ tripping on subway steps ’ ’ with no ‘1 reference to the handrail * * * was asked whether plaintiff had told him that her hand had come in contact with a splinter, and answered: ‘ I remember her saying something about that, sir ’ ”.
Speaking of this the court (p. 302) said: “ This is not only contrary to the physician’s own contemporaneous notes in his own writing made on his initial examination of plaintiff, but it seems a matter of significance that Dr. Greenberg was the ‘ Ralph Greenberg ’ shown by the notice of retainer filed in this court to have been the person who referred plaintiff to her attorney, a fact which was not developed on the trial, but which was disclosed on defendant’s application for a new trial on newly discovered evidence.”
Thus the only similarity between the Cavadi case and this case is that in each the plaintiff was referred to the attorney by the testifying doctor but there, that fact, which might color the doctor’s testimony and which showed that he had or might have an interest in the case beyond that of the ordinary treating physician, was not known by the defendant or disclosed at the trial. The jury had no opportunity to test the doctor’s credibility in the light of that situation. Here, the fact that plaintiff *680 had been referred to the attorneys was known to the defendant not only at but before the trial, and the effect which defendant claimed that circumstance should have was expiated on to the jury at great length. The difference between the two situations is self-expressive.
This memorandum could be concluded at this point with the denial of the motion for the reasons above set forth, but a short reference to some statements made in the moving papers may not be amiss. The affidavit in support of the motion is not made by trial counsel for the defendant, but by someone who was not present in court. With reference to the notice of retainer filed in the Appellate Division, in which Mr. Cohen recites that the plaintiff actually was referred to him by Dr. Buchman, the affidavit says that ‘ ‘ At the time of trial the Court did not give an opportunity to defense counsel to develop that point. The Court admonished defendant’s counsel not to mention what the paper was but to just offer it in evidence, and later, at page 239 the Court refused defendant permission to read the Notice of Retainer at the trial.”
It is true that when trial counsel for defendant offered the notice of retainer in evidence the court said: “ Don’t mention what it is. Just- offer it. Show it to counsel ’ ’. It is obvious that it would have been improper for the jury to be informed of the contents of the paper unless and until it was received in evidence. At the time it was received and marhed in evidence no effort was made by the attorney to read it or any part of it into the record. Later on, and at the conclusion of Dr. Buchman’s cross-examination, counsel said: “At this time, Judge, may I read Defendant’s Exhibit N ” to which the court replied “No, you will read that in summation. Don’t start reading exhibits now.”
The bald statement in the moving affidavit, therefore, that “ the Court refused defendant permission to read the Notice of Retainer at the trial ’ ’ is palpably incorrect. What the court did was to indicate to defendant’ counsel that he would not permit it to be read at that particular time, but would permit it to be read in summation, and that is exactly the course that was pursued by defendant’s counsel. He not only read the referral portion of the retainer to the jury once, but commented upon it time and time again. The inference by one who was not present at the trial, that the contents of the notice of retainer were not called to the attention of the jury, and that the defendant was prohibited from doing so by the court, should not have been indulged in.
The motion is denied.

 In the opposing affidavit it is pointed out that the question asked of Dr. Buchman was: “Did you recommend Mr. Cohen of the law firm of * * * as the lawyers in this ease” and it is claimed that Dr. Buchman testified truthfully because “He did not recommend this case to” the lawyers. It is stated that plaintiff was disturbed because he could not get in touch with his then attorney and that he asked Dr. Buchman to help him. Dr. Buchman says “I suggested that he see another lawyer and when he advised me that he knew no one, at his request, I suggested he see Mr. Cohen. I did not recommend the ease to Mr. Cohen. I gave the plaintiff Mr. Cohen’s name and assumed that he might be of service to the plaintiff at the time and advise him what to do.”